**In the Matter of Jack ROBINSON, Bankrupt.**

**No. 45, Docket 74–1351.**

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1974.

Decided Nov. 8, 1974.

Donald P. Sheldon, Buffalo, N. Y. (Saperston, Wiltse, Day & Wilson and Thomas F. Segalla, Buffalo, N. Y., on the brief), for appellant, Jack Robinson.

William H. Gardner, Buffalo, N. Y. (Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., on the brief), for appellee, Manufacturers and Traders Trust Co.

Before LUMBARD, FEINBERG and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Jack Robinson appeals from an order dated January 15, 1974, of the District Court for the Western District, John T. Curtin, J., affirming a denial of his discharge in bankruptcy upon findings by Beryl E. McGuire, Referee in Bankruptcy. Robinson filed a voluntary petition in bankruptcy on March 3, 1971, which stated his business to be that of a canned meat broker. The petition listed liabilities of $109,640.06 and non-exempt assets of $800. At a creditors meeting on April 16, 1971, Robinson denied under oath that he had made certain statements in January 1971 to Robert F. Spitzmiller, Jr., an assistant vice president of the Manufacturers and Traders Trust Co. of Buffalo, the appellee. On June 8, 1971, the last day for filing objections to Robinson's discharge, the bank filed such objections and petitioned for a determination of whether discharge

was appropriate. After three hearings the referee concluded that Robinson had given false testimony and denied Robinson's discharge. The district court affirmed the referee's decision, whereupon Robinson appealed to this court. We affirm.

## I.

Robinson raises two issues on appeal. First, he claims that the bank failed to file timely its objections to his discharge. The last day of filing objections was June 8, 1971, and the bank filed its objections along with a petition for determination of dischargeability on that day. However, it did not pay the required filing fee of $10 for each document until the following day. The bank did, however, submit a $50 check on June 8th as indemnity against expenses in production of the record. Robinson argues that the late payment of filing fees somehow delays the effective date of the filing until June 9th. We do not agree.

There is no express statutory requirement that a filing fee must be paid before objections can be considered to have been timely filed. Robinson's argument is largely based on the fact that the Bankruptcy Act provides that the initial filing fees required of a bankrupt must be paid before a discharge is granted, Bankruptcy Act § 14(b)(2), 11 U.S.C. § 32(b)(2) (1970). However, the usual procedures followed with respect to payment of the initial filing fee undercut Robinson's argument, because even where the bankrupt fails to pay the initial filing fee, the bankruptcy process still goes forward. See United States v. Kras, 409 U.S. 434, 488–489, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). Furthermore, even if Robinson is correct in asserting that payment of filing fees is a prerequisite for an effective filing, it is arguable in this

case that the fees were in fact paid on June 8th. On that date the bankruptcy court had in its possession the bank's check for $50 and it appears that that check could have been used to pay the filing fees.

Further support for rejection of Robinson's argument is found in the 1972 revision of the Manual of Office Procedures for Bankruptcy Clerks [1] which provides that "[w]here . . . papers are offered for filing without the proper fee, they should nevertheless be accepted for filing and a notation made on the paper itself that the filing fee has not been paid. The matter should then be called to the referee's attention." Thus it appears that the normal practice of bankruptcy courts is to accept papers for filing whether or not filing fees have been paid.

Finally, we note that the purpose of a filing deadline is to bring the bankruptcy proceeding to an end and to permit an expeditious determination of whether there is any reason why the bankrupt should not be discharged. Here this purpose was fully accomplished by the bank's act of filing its objections within the required time period. Whether the filing fees were paid on that day, the next day or the next week does not effect the fulfillment of the deadline's purpose. Accordingly, we hold that the objections were timely filed.

## II.

Robinson's second claim is that the district court erred in sustaining the referee's refusal to issue a discharge. The referee had concluded that Robinson had knowingly, and fraudulently made a false oath in a bankruptcy proceeding. Under the Bankruptcy Act such a false oath is a ground for denying a discharge. Bankruptcy Act § 14(c), 11

---

1. The manual was published by the Federal Judicial Center and was distributed to referees in bankruptcy by the Administrative Office of the United States Courts in November 1972.

U.S.C. § 32(c) (1970); [2] 18 U.S.C. § 152 (1970). [3] Under the Act the person objecting to the discharge must "show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed [one of the acts that bar discharge]." Bankruptcy Act § 14(c), 11 U.S.C. § 32(c) (1970). Once the person opposing the discharge has done this, the burden of proving that he has not committed [one of those acts] shall be upon the bankrupt." Bankruptcy Act § 14(c), 11 U.S.C. § 32(c)(1970).

In the Second Circuit we have held that "[t]he words of the statute requiring that the testimony be given 'knowingly and fraudulently' mean no more than an 'intentional untruth in a matter material to the issue which is itself material.'" In re Melnick, 360 F.2d 918, 920 (2d Cir. 1966) (per curiam) quoting In re Slocum, 22 F.2d 282, 285 (2d Cir. 1927). Great weight is given to the referee's findings because he saw and heard the witnesses and his findings are not to be reversed unless they are clearly erroneous. In re Melnick, *supra.*

The testimony in question was given at an adjourned session of the First Meeting of the Creditors of the bankrupt which was held on April 16, 1971. At that proceeding Robinson was asked several questions concerning statements he allegedly made to officers of the bank in January 1971. At the subsequent hearing on the bank's objections to Robinson's discharge Spitzmiller testified that Robinson had told him in January that he had some $50,000 in accounts receivable. On April 16, however, Robinson denied that he had made such statements when he was asked by the bank's counsel about each alleged account receivable.

Robinson claims that his statements were not intentional untruths because he did not understand the questions that he was asked. While it is true that at times Robinson seemed confused as to whether he was being asked if he had told the bank in January that he had accounts receivable or if he had accounts receivable in January, [4] other parts of the exchange between Robinson and the bank's attorney show that Robinson did understand the questions. [5] The referee concluded that the bank "established by a fair preponderance of the evidence that the bankrupt knowingly and fraudulently gave false testimony in this proceeding" and that Robinson's disclaimers were not credible. The record supports the referee's findings. In re Melnick, *supra.* The cases cited by Robinson do not support his conten-

2. Section 14(c) provides that "[t]he Court shall grant the discharge unless satisfied that the bankrupt has (1) committed an offense punishable by imprisonment, as provided under Section 152 of Title 18 . . . ."

3. Section 152 of the Criminal Code provides that "[w]hoever knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceeding . . . [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both."

4. Q. . . . Did you tell Mr. Spitzmiller on January 11th that that account receivable was owing?
A. There was no accounts receivable.
Q. I understand that.
A. I told you that.
Q. And did you not tell Mr. Spitzmiller on that—
A. How could there by any outstanding when I just told you that there isn't any?

5. Q . . . The next item that Mr. Spitzmiller mentions is Malecki Sausage, four thousand nine hundred dollars. Did you tell Mr. Spitzmiller that you had that account receivable owing?
A. No.
Q. The next item is Twin Fair, four thousand five hundred dollars. Did you give that information to Mr. Spitzmiller?
A. I talked to Mr. Spitzmiller in the past and he asked me many occasions who owes me money.
Q. I'm speaking specifically about January 11th, 1971, Mr. Robinson, do you recall that conversation?
A. Yes, I believe so.
Q. And on that conversation, did you tell him that Twin Fair owed you four thousand five hundred dollars?
A. No.

tion that he lacked the requisite fraudulent intent. These cases generally involved failures of bankrupts to list inconsequential property interests on their schedules of assets. The court inferred that there was no fraudulent intent because the amounts involved were so small. See, e. g., In re Tabibian, 289 F.2d 793, 797 (2d Cir. 1951); In re Taub, 98 F.2d 81 (2d Cir. 1938). Robinson's testimony concerned thousands of dollars in alleged accounts receivable and Robinson was closely examined as to each alleged account. It is simply not reasonable to conclude that his false statements were unintentional.

■ Robinson's principal argument is that his misstatements did not concern a material matter. He argues that his false statements were immaterial for two reasons. First, he notes that the bank did not rely to its detriment on his claims of accounts receivable since all of the $35,000 owed by Robinson to the bank had been advanced prior to January 1971. This argument is irrelevant because the false testimony at issue here is not the statements that Robinson allegedly made to the bank, but rather his denials under oath at the bankruptcy proceeding that he made those statements to the bank. Robinson's discharge was not denied because he testified falsely to the bank in January, but rather because he testified falsely in the bankruptcy proceeding in April. It is the materiality of his testimony in April that is at issue and its materiality must be judged by the situation at the time that it was made.

■ Robinson's second argument is that his false statement was immaterial because a true statement on his part would not have benefited his creditors. He claims that even if he admitted that he had told the bank he had accounts receivable in January, his creditors would not have received any more money.

We have consistently held, however, that materiality does not require a showing that the creditors were prejudiced by the false statement. See Morris Plan Industrial Bank v. Finn, 149 F.2d 591, 952 (2d Cir. 1945); In re Slocum, 22 F.2d 282, 285 (2d Cir. 1927) ("[T]he materiality of the false oath will not depend upon whether in fact the falsehood has been detrimental to the creditors."). See also In re Melnick, *supra*; In re Parsons, 88 F.2d 428 (2d Cir. 1951).

Even though truthful responses to the questions propounded by the bank's counsel would not have increased the value of the bankrupt's estate, they were certainly material to discovering what, if any, assets Robinson may have had. In January 1971 Robinson apparently told the bank that he had accounts receivable in excess of $50,000. When he filed his petition in bankruptcy less than two months later, Robinson claimed that he had no accounts receivable. The bank, as Robinson's major creditor, certainly had a legitimate interest in trying to find out what had become of Robinson's recently claimed accounts receivable and the questions put to him by the bank's counsel were certainly relevant to that inquiry. Contrary to the dissent's assertion, the bank did not know in January that Robinson had *no* accounts receivable. The record indicates that it only knew that, as to some of the accounts, the amounts claimed by Robinson could not be verified. So far as the bank knew it was possible that some amounts were owing. Thus, the bank's questions were relevant to the issue of tracking down the disposition of Robinson's assets.

The statute only requires that the bankrupt make a "false oath." We have excluded minor or inconsequential misstatements from its coverage. However, it goes too far to suggest that the words "false oath" means "a false oath that conceals assets of the bankrupt's estate." Such an interpretation is clearly inappropriate since the first clause of section 152 deals with concealment of as-

sets.[6] To require that a false oath diminish the value of the bankrupt's estate would in effect render the "false oath" clause nugatory since such a standard would track the requirements of the first clause of section 152. Moreover, most authorities agree that the false oath statute is essentially equivalent to a perjury statute. Thus only the basic requirements of perjury need be proven. D. Cowans, Bankruptcy Law and Practice § 201 (1963); 7 H. Remington, Bankruptcy Law § 3081 (1955).

This court has always regarded statements made during examination of a bankrupt to be "serious business." In re Diorio, 407 F.2d 1330, 1331 (2d Cir. 1969). As Robinson's brief admits, "[A] discharge is a privilege granted the honest debtor and is not a right accorded all bankrupts." In any judicial proceeding concerned with establishing the truth, those who testify must be under an obligation to speak truthfully at all times. In a bankruptcy proceeding the creditors of the bankrupt often stand to lose considerable sums of money. It is not surprising that Congress would want to ensure that testimony in such proceedings is truthful. Likewise the courts should not countenance conscious disregard of the truth.

Affirmed.

OAKES, Circuit Judge (dissenting):

I agree with the majority that the bankrupt's technical argument on time of filing objections borders on the absurd. But I fail to see the materiality of the bankrupt's false statements made at the first meeting of creditors on April 16, 1971. Concededly he had no accounts receivable either on January 11, 1971, or on April 16, 1971. He is held to have stated falsely on April 16 that he did not tell the bank on January 11, 1971, that he *did* have certain accounts receivable consisting of specific customers of his in his capacity as a canned meat broker. Thus he is found to have stated to the bank on January 11, and this would be his first

falsehood, that he did have several specific accounts receivable. The bank concededly did not rely on that first falsehood in extending credit, nor did it do so by neglecting to enforce its loan agreement. By virtue of the fact that his petition was filed on March 3, moreover, any preference achieved by such enforcement would have been set aside. Thus, in any possible end result it is immaterial whether the bankrupt made the false statement to the bank on January 11. Can it be said, then, that his false denial on April 16 of having made an immaterial statement in January has any real bearing?

To say that "materiality does not require a showing that the creditors were prejudiced by the false statement," as the majority says (opinion at 1188), however, is not to say that every statement under oath is material. The majority goes on to argue that counsel for the bank had a right to inquire into what had happened to the bankrupt's "recently claimed accounts receivable" when the petition showed none such. I agree with that proposition; when the bankrupt testified that he had none in April and that he had had none in January, however, it is difficult to fathom what information could be gleaned from forcing him to admit that he had lied in January about having these specific accounts receivable. All that a truthful answer in April would have led to was an admission of his lying in January. The January falsehood was not made under oath during bankruptcy proceedings and thus would not itself have been grounds for denial of the discharge.

But even if the bank might otherwise have "had a legitmate interest in trying to find out what had become of Robinson's recently claimed accounts receivable," in the majority's words (opinion at 1188), testimony by the bank's Zone Supervisor, Mr. George Sheldon, showed that within two days after the meeting of January 11 the bank "had done some 'checking' and had found we could not confirm any of the receivables" and in-

---

6. "Whoever knowingly and fraudulently conceals from . . . creditors in any bank-

ruptcy proceeding, any property belonging to the estate of the bankrupt . . .

deed had so "advised Mr. Robinson," the bankrupt, on January 13 (App. 244).[1] This being true, it is difficult to see what the purpose of the line of questioning was, other than to get the bankrupt to deny that he had previously told a lie and in the process to tell another one so as to effectuate the denial of his discharge. The purpose could not have been to track down "recently claimed accounts" since the bank knew that none existed in April or in January.

If I am correct that the bankrupt's testimony, assumed to be false, is nevertheless not material, the question of law becomes whether materiality is a necessary element of proof for a conviction under 18 U.S.C. § 152 which in turn, under the Bankruptcy Act, § 14(c)(1), 11 U.S.C. § 32(c)(1), is grounds for a denial of a discharge. Section 152 of 18 U.S.C. specifically spells out the various acts in connection with bankruptcy such as fraudulent concealment of assets, presentation of false claims against the estate, receipt of property from a bankrupt and the like—including "knowingly and fraudulently mak[ing] a false oath or account . . ."—that are criminal offenses.[2]

The case law is now and, as I have understood it, always has been, that materiality *is* an essential ingredient— even though materiality is not dependent on actual injury to creditors. Metheany v. United States, 365 F.2d 90, 93

(9th Cir. 1966), 390 F.2d 559 (9th Cir. 1968), cert. denied, 393 U.S. 824, 89 S. Ct. 81, 21 L.Ed.2d 94 (1968); Meer v. United States, 235 F.2d 65, 67 (10th Cir. 1956); United States v. Margolis, 138 F.2d 1002, 1004, 1005 (3d Cir. 1943); In re Slocum, 22 F.2d 282, 284, 285 (2d Cir. 1927). *See also* 1A Collier, Bankruptcy (14th ed.) ¶ 14.25 at 1338; In re Lozito, 113 F.2d 764 (2d Cir. 1940); In re Taub, 98 F.2d 81 (2d Cir. 1938). As was said in In re Steiker, 380 F.2d 765, 768 (3d Cir. 1967):

> A false oath knowingly and fraudulently made, however, is not all that must be established. It must also be shown that the false oath was given in relation to some material matter in the bankruptcy proceedings. In re Kaufhold, supra; Hanover-Capital Trust Co. v. Meyer, 57 F.2d 815 (C.A. 3, 1932); 1 Collier, Bankruptcy ¶ 14.-25 at 1324, 7 Remington, Bankruptcy § 3086; Annot., 59 A.L.R.2d 791, 831 ("Materiality") (1958). It has been said that the determination of whether the false oath is material depends on whether the inquiry bears a relationship to the bankrupt's business transactions or his estate, Willoughby v. Jamison, 103 F.2d 821, 824 (C.A. 8), cert. denied, 308 U.S. 588, 60 S.Ct. 111, 84 L.Ed. 492 (1939), or concerns the "discovery of assets, business dealings, and relations of the bankrupt, the existence and disposition of

---

[s]hall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 152 (1970).

1. In light of the majority's statement on page 1188 of the opinion that "the bank knew it was possible that some amounts were owing" in January, 1971, it is interesting to note that the bank's attorney asked no questions whatsoever as to the whereabouts of those assets "possibly owing." He did ask what happened to the accounts receivable owing in 1970, the last year the bankrupt said that he had accounts owing. As to the accounts of 1971, the bank's attorney's questions dealt exclusively with the bankrupt's past statements, not with his accounts receivable. At one point he even made this clear by telling the bankrupt,

"I'm asking not whether it [an account receivable] was in fact outstanding, Mr. Robinson. I'm asking whether you told Mr. Spitzmiller it was outstanding." App. 102.

2. I put to one side the suggestion of the majority that the false oath provision cannot be construed to require for conviction a diminution of the value of the bankrupt's estate since it would "track the requirements" of the first, or concealment-of-asset, clause. While I disagree with the argument since concealment of assets and diminution of value are by no means synonymous, this dissent does not stand or fall on the question whether diminution or concealment of assets is involved. Rather I believe the question is whether materiality is an element of the offense.

his property and debts and the like."
7 Remington, Bankruptcy § 3086.
(Footnotes omitted.)

I will agree that courts must be careful not to overlook consciously false statements that could in some way affect the outcome of the bankruptcy, the presentation or proof of a claim, the discovery of an asset, or the like. I fail to see how this bankrupt's statements, denying his earlier misstatement but correctly describing his business, could have had any bearing on any aspect of the estate, given the record here.

Accordingly, I would reverse.